UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

AMANDA JACKSON,                    )
for M.L.,                          )
                                   )
                Plaintiff,         )
                                   )
        v.                         )    No.  4:04CV714 FRB
                                   )
JO ANNE B. BARNHART,               )
Commissioner of Social Security,   )
                                   )
                Defendant.         )


<u>**MEMORANDUM AND ORDER**</u>

        This cause is before the Court on plaintiff's appeal of
an adverse ruling of the Social Security Administration.    All
matters are pending before the undersigned United States Magistrate
Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).

## I.  Procedural History

        On February 26, 2003, plaintiff Amanda Jackson filed an
application for Supplemental Security Income (SSI) pursuant to
Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, <u>et</u> <u>seq.</u>,
on behalf of her seven-year-old son, M.L., in which plaintiff
claimed that M.L. became disabled on December 15, 2002.  (Tr. 36-
38.)  On initial consideration, the Social Security Administration
denied plaintiff's claim for benefits.  (Tr. 24, 26-29.)[1]

_____

        [1]At the administrative level, this cause was included in a
test group pursuant to 20 C.F.R. § 416.1406 (2003), whereby the
reconsideration step of the administrative review process was
eliminated, and the plaintiff was permitted to seek a hearing from
an Administrative Law Judge upon the initial adverse determination.
(Tr. 13.)

On October 8, 2003, a hearing was held before an Administrative Law Judge (ALJ). (Tr. 221-43.) Plaintiff and M.L. testified and were represented by counsel. On December 17, 2003, the ALJ issued a decision denying plaintiff's claim for benefits. (Tr. 10-18.) On April 10, 2004, the Appeals Council denied plaintiff's request for review of the ALJ's decision. (Tr. 3-5.) The ALJ's determination thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II.  Evidence Before the ALJ

A.  <u>Plaintiff's Testimony</u>

At the hearing on October 8, 2003, plaintiff testified in response to questions posed by the ALJ and counsel. Plaintiff testified that she is M.L.'s mother and that M.L. has lived with her since birth. Plaintiff has a ten-year-old daughter and eight-month-old daughter whom also live with her. (Tr. 225.) Plaintiff testified that M.L.'s seven-year-old cousin stays with them during the week. (Tr. 231.) Plaintiff testified that M.L. is currently in the second grade at Hodgen Elementary. (Tr. 225-26.)

Plaintiff testified that M.L. is being treated for a heart condition for which he underwent surgery. (Tr. 226-27.) Plaintiff testified the surgery was unsuccessful in that M.L. continues to have leakage in the heart. (Tr. 227.) Plaintiff testified that M.L. last saw a doctor regarding the condition in August, at which time it was determined that M.L.'s condition would

- 2 -

be monitored for the time being, after which any other decisions regarding further surgery would be made. (Tr. 227-28.) Plaintiff testified that she was advised that M.L. should take it easy and not engage in heavy running, tough playing, or swimming. Plaintiff testified that M.L. takes no medication and sees no other doctors for any reason. (Tr. 228.) Plaintiff testified that M.L. has had no recent complaints regarding his heart, but that he sometimes complains of chest pain and shortness of breath. (Tr. 236.)

Plaintiff testified that during the previous school year, M.L.'s school counselor recommended that M.L. see a psychiatrist to address behavior issues. (Tr. 228-29.) Plaintiff testified that the counselor then began meeting with M.L., M.L.'s teachers and plaintiff twice each week to address M.L.'s school work and behavior. (Tr. 229.) Plaintiff testified that during the current school year, M.L.'s teacher has reported that M.L. has difficulty staying focused and is easily distracted. (Tr. 230.) Plaintiff testified that M.L. has had two or three behavior referrals during the current school year which consisted of notes sent home reporting that M.L. needed to improve his behavior. (Tr. 236-37.) Plaintiff testified that during the previous school year, she was at school twice each week addressing behavior problems which resulted in detention and suspensions. Plaintiff testified that a behavior plan in place did not improve M.L.'s behavior. (Tr. 237.) Plaintiff testified that M.L.'s primary issue was that he was not

staying focused.  (Tr. 238.)

Plaintiff testified that M.L. is currently enrolled in two resource classes at school and that she provides him additional help at home.  (Tr. 235, 238.)  Plaintiff testified that she was not aware of any special accommodations provided to M.L. at school, such as additional time for testing or for homework.  (Tr. 238.)

Plaintiff testified that M.L. is not involved in after-school activities.  Plaintiff testified that M.L. was previously enrolled in a boy's club, but that she withdrew him after the heart surgery.  (Tr. 231-32.)  Plaintiff testified that M.L. watches a lot of television, reads and likes to play video games.  (Tr. 232, 234.)  Plaintiff testified that after getting home from school, M.L. does homework for approximately three hours, watches television, takes a bath, and then goes to bed.  Plaintiff testified that she tries to take M.L. somewhere on Sundays to do different things with him.  (Tr. 232.)  Plaintiff testified that M.L. sometimes "sits and chats" with neighborhood children.  (Tr. 233.)

Plaintiff testified that M.L. is able to dress himself and chooses his own clothes.  Plaintiff testified that M.L. has no difficulty feeding himself and is able to bathe himself.  (Tr. 234-35.)

B.   <u>Testimony of M.L.</u>

M.L. testified in response to questions posed by the ALJ.

M.L. testified that he is seven years old.  M.L. testified that he likes his teacher at school and that she makes him learn.  M.L. testified that he has a best friend at school who is his age and in his class.  (Tr. 239.)  M.L. testified that his favorite food is green peas and that he likes to play football.  (Tr. 240-41.)  M.L. testified that he sometimes does not get along with his sister. (Tr. 241.)

### III.  Medical, Counselor and School Records

M.L. was born on February 6, 1996.  A possible patent ductus arteriosis (PDA) murmur was noted.  (Tr. 146.)  On February 12, 1996, Dr. John D. Bouhasin ordered a cardiology consultation. (Tr. 148.)  An EKG performed on February 13, 1996, showed normal sinus rhythm with occasional premature ventricular contractions (PVC's) and probable right ventricular hypertrophy.  An echocardiogram performed that same date showed a mild perimembranous subaortic ventricular septal defect (VSD).  (Tr. 152-53, 154.)  Dr. Su-Chiung Chen instructed that M.L. return in two months for follow up of his VSD.  (Tr. 153.)

M.L. returned to Dr. Chen on July 9, 1997.  (Tr. 156-59.) Plaintiff reported to Dr. Chen that M.L. was doing well.  (Tr. 156.)  An EKG performed that same date was normal.  Chest x-rays showed a large cardiothymic shadow.  The peripheral pulmonary vascularity was noted to be slightly increased.  An echocardiogram showed a small left ventricular to right ventricular jet at the

perimembranous area, the rate of which measured to be four meters per second. M.L. was diagnosed with perimembranous and small VSD. Dr. Chen explained to plaintiff the importance of regular follow up visits and instructed that M.L. return in nine months for follow up. (Tr. 157.)

M.L. returned to Dr. Chen on September 8, 1998, for follow up of his VSD. M.L.'s grandmother reported that M.L. had been well except for having chicken pox months earlier. M.L.'s grandmother reported that M.L. kept up with his peers with no difficulty. An EKG was within normal limits. M.L. was diagnosed with small VSD, stable. It was recommended that M.L. return in one year for follow up, unless unusual symptoms appeared. (Tr. 163.)

M.L. returned to Dr. Chen on August 16, 1999. (Tr. 160-62.) M.L.'s grandmother reported no shortness of breath, cyanotic, chest pain, palpitations, or syncope. An EKG performed was within normal limits. Chest x-rays showed cardiomegaly. An echocardiogram showed a small subaortic VSD with normal pulmonary artery pressure and slight aortic regurgitation. M.L. was diagnosed with small ventricular septal defect, stable. It was recommended that M.L. return in six months for follow up. (Tr. 160.)

On February 4, 2000, an audiogram was conducted at Cardinal Glennon Children's Hospital on account of M.L. failing a hearing screening at school. The results of the audiogram were normal. (Tr. 164.)

M.L. returned to see Dr. Chen on March 2, 2001, and was examined by Dr. Saadeh Jureidini. (Tr. 165-66.) Dr. Jureidini noted M.L. to be totally asymptomatic, growing well and developing normally. EKG was normal. An echocardiogram showed mild AI and mild dilation of the LV. Dr. Jureidini noted the VSD to be "clearly very small and perimembranous. The velocity across the VSD was in the range of 5 meters/second, indicating absolutely normal RV and pulmonary arterial pressure." Dr. Jureidini noted the aortic regurgitant jet to be narrow and short. M.L. was diagnosed with perimembranous VSD, small; and aortic regurgitation, mild. Dr. Jureidini stated that he would not recommend intervention. (Tr. 165.) M.L. was to return in one year for follow up. (Tr. 166.)

M.L. returned to Dr. Jureidini on April 26, 2002, for follow up, who noted M.L. to be asymptomatic and to continue to be very active without limitations, as confirmed by plaintiff and M.L.'s grandmother. Dr. Jureidini noted M.L.'s EKG to be unchanged and to remain normal. Chest x-rays showed mild cardiomegaly, which was less pronounced than that shown in the 1999 x-ray. The echocardiogram continued to show a small VSD with mild LV dilation and mild AI. Dr. Jureidini noted that "[t]he jet of AI was totally unchanged, continued to be narrow and reaches the mid mitral valve level. The RV pressure and PA pressure were totally normal." (Tr. 167.) M.L. was diagnosed with small VSD; mild AI, stable; and mild

LV dilation. M.L. was to return for follow up in one year. Dr. Jureidini noted that if there were any concerns about the progression of the AI, then closure of the VSD and repair of the mitral valve would be recommended. (Tr. 168.)

M.L. was suspended from school on September 25, 2002, for two days for punching and pushing down another boy. (Tr. 95, 99, 100.) M.L. was in the first grade. In October 2002, M.L. received two discipline referral forms for fighting, refusing to follow rules or directions, disrespectful behavior, leaving the room or assigned area without permission, and/or chronic disruption or disorder in the classroom. (Tr. 97, 98.)

In November 2002, M.L. underwent a Psychological Educational Assessment through St. Louis Public Schools. (Tr. 91-112.) The screening indicated no concerns in the areas of vision, hearing, health/motor, speech/language, cognitive functioning, or adaptive behavior. (Tr. 92.) The Wechsler Intelligence Scale for Children was administered, which measured M.L. to be in the borderline range of intelligence. M.L.'s verbal IQ was measured to be 88; performance IQ was measured to be 78; and full scale IQ was measured to be 78. M.L. scored in the 29th percentile on the Draw-a-Person exam. M.L. scored at the 30th percentile on the Bender-Gestalt Test of Visual Motor Integration, with M.L.'s developmental age measured to be between five years, nine months to five years, eleven months. M.L.'s performance on the Vineland Adaptive

Behavior Scale showed M.L.'s adaptive levels at communication, daily living skills, socialization, and motor skills to be adequate; with M.L.'s adaptive behavior composite determined to be adequate and at an age-equivalent level of six years, one month. M.L.'s level of maladaptive behavior was found to be intermediate. (Tr. 108.) On the Woodcock-Johnson Tests of Achievement, M.L. scored at the 0.2 percentile for word identification; 2nd percentile for passage comprehension; 36th percentile for math calculation; 20th percentile for math reasoning; 17th percentile for writing samples; and 0.1 percentile for broad reading. M.L.'s kindergarten and first grade teachers completed Behavior Evaluation Scales which recorded their observations as to learning problems, interpersonal difficulties, inappropriate behavior, unhappiness or depression, and physical symptoms or fears. M.L.'s total scale as determined by both teachers was rated to be very poor. (Tr. 109.) Specific comments from M.L.'s teachers included that M.L. has a short attention span, cannot stay focused, is disruptive in class, and teases and bullies his peers. (Tr. 102-07.) As a result of this assessment, numerous recommendations were made with respect to M.L.'s learning environment and behavioral issues. (Tr. 111-12.) St. Louis Public Schools identified M.L. as a student with a specific learning disability in the area of basic reading skills and opined that the disability was not correctable without special education and related services. (Tr. 113.)

On December 13, 2002, the St. Louis Public Schools held an Individualized Education Program (IEP) meeting regarding M.L.'s placement. (Tr. 73, 88.) M.L. was in the first grade. (Tr. 73.) It was noted that M.L.'s teacher reported that M.L. was currently functioning at the kindergarten level in reading, mathematics and written expression. She reported further that M.L. was easily distracted, demonstrated short attention span, did not complete tasks, and socialized at inappropriate times. It was noted that the Wechsler Intelligence Scale for Children was administered to M.L. on November 14, 2002, which measured M.L.'s level of intellectual ability to be in the borderline range. M.L.'s adaptive behavior, as reported by plaintiff, showed M.L. to be functioning at an adequate adaptive level, commensurate with his peers. As to M.L.'s social, emotional and behavioral functioning, it was noted that M.L. had difficulty making friends, teased and bullied his peers, and could not keep his hands to himself. M.L.'s fine and gross motor skills were considered to be adequate for school. (Tr. 75.) M.L. passed screenings for vision, hearing, and speech and language. (Tr. 76.) It was noted that M.L. was experiencing difficulty in the specific area of reading and that a small, structured setting would provide the best opportunity for improvement. (Tr. 77.) It was determined that a Behavior Management Plan would be implemented inasmuch as M.L.'s behavior, and specifically, his daily failure to remain in his seat in the

classroom, impeded his learning and/or that of others. (Tr. 79, 85.) It was further determined that a Special Education Instructor would be used 450 minutes each week, and that placement outside the classroom in a small group setting twenty-one to sixty percent of the time would meet M.L.'s needs. (Tr. 86, 89.)

Another IEP meeting was held on February 24, 2003. (Tr. 116, 132, 133.) It was reported that M.L. continued to read at the kindergarten level, but that his math skills were commensurate with his current grade. M.L.'s work habits were noted to have improved considerably since he had been moved to an isolated area in the classroom. M.L. was noted to now remain seated and stay on task. It was noted that M.L. continued to have trouble making friends in that he intimidated and pestered his peers. (Tr. 118.) It was noted that M.L. had recently been suspended from school due to fighting on a field trip, and that M.L.'s suspensions had totaled ten days. (Tr. 118, 134.) M.L. was noted to continue to show aggression toward his peers and staff and that such behavior was "[d]ue to low academic progress [and that M.L.] is taking his frustrations out on peers, fighting and aggression." (Tr. 134.) It was reported in a Functional Behavioral Assessment that M.L. was immature and had trouble remaining focused; that M.L. gets out of his seat and crawls on the floor; and that M.L. says inappropriate things and acts out. It was opined that M.L. engaged in such behavior to seek attention in that he "has a lot of adult attention

at home and expects it at school." It was noted that M.L. is motivated when he is isolated from his peers and needs praise and encouragement. (Tr. 135.) It was determined that M.L.'s current program and placement was appropriate to address his behavior. (Tr. 134.) M.L.'s health, motor skills, speech and language, vision, and hearing were not areas of concern. (Tr. 118-19.) Instructional modifications and accommodations were incorporated with specific goals identified. (Tr. 120-21, 125-28.) Strategies were also identified to address M.L.'s behavioral issues, and specifically, his frequent verbal abuse of and inappropriate interaction with peers. (Tr. 129.) It was determined that a Special Education Instructor would be used 450 minutes each week. (Tr. 130.)

M.L.'s school progress report dated February 26, 2003, showed M.L. to need improvement in the areas of language, mathematics, spelling, social studies, science, and homework. M.L.'s achievement was noted to be unsatisfactory in the areas of reading and behavior. (Tr. 137.)

In March 2003, non-examining, consulting physicians Isabel Mora and Aine Kresheck completed a Childhood Disability Evaluation Form for disability determinations. (Tr. 178-83.) M.L.'s educational diagnosis of learning disabled was noted, as well as M.L.'s IQ scores placing him in the borderline range of intelligence. (Tr. 178.) Drs. Mora and Kresheck opined that M.L.

had no limitation in moving about and manipulating objects, caring for himself, or in his health and physical well being. (Tr. 180.) Drs. Mora and Kresheck opined that M.L. had less than marked limitation in the domains of acquiring and using information, attending and completing tasks, and interacting and relating with others. (Tr. 182.) In making their assessment, Drs. Mora and Kresheck reviewed the February 2002 cardiology treatment notes, November 2002 Psychological Assessment, December 2002 IEP meeting, and February 2003 IEP meeting. (Tr. 178-83.) It was specifically noted that M.L. was taking no medications and not undergoing any psychiatric treatment. (Tr. 182, 183.) Drs. Mora and Kresheck opined that M.L.'s impairments did not meet, medically equal, or functionally equal the Social Security Listings. (Tr. 178.)

M.L. returned to Dr. Jureidini on May 9, 2003. (Tr. 184-85.) Dr. Jureidini noted M.L. to remain totally asymptomatic and to be growing and developing well. An EKG was normal. Chest x-rays showed mild cardiomegaly and LV contour. The VSD was noted to be small, with perhaps a slight prolapse of the right aortic cusp. (Tr. 184.) Mild aortic regurgitation was noted, which Dr. Jureidini opined could be interpreted as moderate in some views. (Tr. 184-85.) The jet was noted to reach mid-cavity. Slight retrograde flow was noted in the aortic arch. M.L. was diagnosed with small VSD and progression of aortic stenosis, perhaps mild to moderate. Dr. Jureidini opined that surgery should be considered

to close the VSD and repair the aortic valve.  (Tr. 185.)

M.L. was admitted to Cardinal Glennon Children's Hospital on June 4, 2003, to undergo VSD and aortic valve repair.  M.L. was discharged on June 8, 2003.  (Tr. 201-15.)  M.L. returned for follow up on June 20, 2003, at which time it was noted that he experienced no post-operative problems.  M.L. was noted to be doing very well.  It was also noted that M.L. was playing and eating well.  (Tr. 216.)

M.L. was admitted to the emergency room at Children's Hospital on June 22, 2003, complaining of chest pain in that he felt the edges of his incision were coming apart.  It was noted that M.L. had been more active during the past several days, which included going to the park.  (Tr. 197.)  Chest x-rays showed no acute cardiopulmonary disease.  (Tr. 200.)  It was noted that M.L.'s pain resolved shortly after coming to the emergency room. (Tr. 197-98.)  Instructions were given that M.L. take Tylenol or Tylenol with codeine as needed.  (Tr. 197.)

Upon M.L.'s follow up visit with Dr. Jureidini on August 29, 2003, instruction was given for M.L. to follow up in one year. (Tr. 218-20.)

In a weekly progress report dated October 3, 2003, M.L.'s teacher reported to plaintiff that M.L. needed a great deal of assistance with his work habits and was easily distracted.  It was further reported that M.L.'s behavior needed improvement, as well

as M.L.'s effort and attitude.  M.L.'s teacher reported that "[M.L.] does not utilize his class time appropriately.  He has to be reminded constantly of appropriate classroom behavior." (Tr. 143.)

### IV.  The ALJ's Decision

The ALJ found that M.L. had not engaged in substantial gainful activity since birth.  The ALJ found that M.L.'s impairments included status-post surgical correction of a mild ventricular septal defect and aortic regurgitation, and borderline intellectual functioning.  The ALJ determined that M.L. probably had less than marked limitation in acquiring and using information, attending to and completing tasks, interacting and relating with others, and health and physical well being, but that M.L. had no medically established limitations in any other domains of functioning.  The ALJ determined the allegations that M.L. had marked or extreme functional limitations not to be credible.  The ALJ determined that M.L. had no medical impairment or combination of impairments which met or medically equaled the criteria of any impairment listed in Parts A or B of Appendix 1, Subpart P, Regulations No. 4.  The ALJ determined M.L. not to have a medically determinable physical or mental impairment or combination of impairments which resulted in marked or severe functional limitations.  The ALJ therefore found M.L. not to be under a disability at any time through the date of the decision. (Tr. 17.)

## V. Discussion

A claimant under the age of eighteen is considered disabled and eligible for Supplemental Security Income under the Social Security Act if he "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(I).

The Commissioner is required to undergo a three-step sequential evaluation process when determining whether a child is entitled to SSI benefits. First, the Commissioner must determine whether the child is engaged in substantial gainful activity. If not, the Commissioner must then determine whether the child's impairment, or combination of impairments, is severe. Finally, if the child's impairment(s) is severe, the Commissioner must determine whether such impairment(s) meets, medically equals or functionally equals the severity of an impairment listed in Appendix 1 of Subpart P of Part 404 of the regulations. 20 C.F.R. § 416.924(a). If the impairment(s) meets or medically equals a Listing, the child is disabled. If a child's impairment does not meet or medically equal a listed impairment, the Commissioner will assess all functional limitations caused by the child's impairment to determine whether the impairment functionally equals the Listings. 20 C.F.R. § 416.926a.

Functional equivalence is measured in several ways.  If the child's condition results in extreme limitations in one or more specific functions which are described as criteria for disability in the listed impairments, the child will be found to be disabled. 20 C.F.R. § 416.926a(b)(1).  In addition, if a child's condition results in "extreme" limitation of functioning in one broad area of functioning, or "marked" limitation of functioning in two broad areas of functioning, the child will be found to be disabled.  20 C.F.R. § 416.926a(b)(2).  If this analysis shows the child not to have an impairment which is functionally equal in severity to a listed impairment, the ALJ must find the child not disabled. Oberts o/b/o Oberts v. Halter, 134 F. Supp. 2d 1074, 1082 (E.D. Mo. 2001).

The Commissioner's findings are conclusive upon this Court if they are supported by substantial evidence.  42 U.S.C. § 405(g); Young v. Shalala, 52 F.3d 200 (8th Cir. 1995) (citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)).  Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion.  Briggs v. Callahan, 139 F.3d 606, 608 (8th Cir. 1998).  In evaluating the substantiality of the evidence, the Court must consider evidence which supports the Commissioner's decision as well as any evidence which fairly detracts from the decision.  Id.  Where substantial evidence supports the Commissioner's decision, the decision may not

be reversed merely because substantial evidence may support a different outcome. <u>Id.</u>

In this cause, plaintiff raises no issue relating to the Commissioner's determination that M.L.'s impairments do not meet or medically equal a listed impairment. Instead, plaintiff argues only that the Commissioner's determination that M.L.'s impairments do not functionally equal a listed impairment is not supported by substantial evidence. Specifically, plaintiff argues that the ALJ erred in failing to discuss all areas of functioning as required by the Regulations. Plaintiff further argues that the ALJ's determination that M.L. does not suffer marked and severe limitations in three of the six broad areas of functioning is not supported by substantial evidence. Finally, plaintiff claims that the ALJ failed to accord proper weight to evidence adduced from M.L.'s teachers, evaluators, IEP documents, and parents in the cause.

## A.   <u>Broad Areas of Functioning</u>

As set out above, when a child's severe impairments are determined not to meet or medically equal a Listing, the Commissioner is required to determine whether and to what extent the child's impairments affect broad areas of functioning as defined by the Regulations, and thus whether such impairments functionally equal a Listing. To "functionally equal the Listings," the impairment must be of Listing-level severity, <u>i.e.</u>,

it must result in "marked" limitations in two domains of functioning, or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(a). The domains are "broad areas of functioning intended to capture all of what a child can or cannot do." 20 C.F.R. § 416.926a(b)(1). The six domains used by the Commissioner in making such a determination are: 1) Acquiring and Using Information; 2) Attending and Completing Tasks; 3) Interacting and Relating with Others; 4) Moving About and Manipulating Objects; 5) Caring for Oneself; and 6) Health and Physical Well-Being. Id. As such, to be determined disabled, a child-claimant must have an "extreme" limitation in one domain, or a "marked" limitation in two domains. 20 C.F.R. § 416.926a(a).

In this cause, the ALJ concluded that M.L. had no functional limitations in the areas of Moving About and Manipulating Objects, and Caring for Oneself. As to M.L.'s functional limitations in the areas of Acquiring and Using Information, Attending to and Completing Tasks, Interacting and Relating with Others, and Health and Physical Well-Being, the ALJ concluded such limitations to be less than marked. (Tr. 17.) As such, because the ALJ found M.L. not to have an extreme limitation in one domain or a marked limitation in two domains, the ALJ determined M.L. not to be under a disability in accordance with the Regulations. Plaintiff claims, however, that the ALJ discussed only the domains of Acquiring and Using Information and Interacting

and Relating with Others, and thereby erred in failing to discuss the remaining domains. A review of the ALJ's decision belies plaintiff's contention.

In his written decision, the ALJ addressed and discussed all domains of functioning as required by the Regulations. With respect to those domains plaintiff claims the ALJ omitted, that is, Attending and Completing Tasks, Moving About and Manipulating Objects, Caring for Oneself, and Health and Physical Well-Being, the ALJ discussed the evidence of record relating to each and found M.L.'s impairments not to cause any more than mild restrictions therein. Relating to M.L.'s physical abilities, the ALJ fully discussed the evidence which included treatment and surgical notes from M.L.'s treating physician, reports from the November 2002 evaluation, reports from M.L.'s classroom teachers, and the testimony of M.L. and his mother (Tr. 15-16) and, on the basis thereof, found that M.L. "had nothing more than a slight or mild limitation in terms of physical health and well-being" and, further, that there was "no evidence of any restrictions in terms of motor skills or self-care abilities." (Tr. 16.) Likewise, referring to the results obtained from the November 2002 evaluation and the February 2003 IEP meeting, the ALJ determined M.L. to have less than marked limitation in the domain of Attending to and Completing Tasks. While this determination was made with the recognition that M.L. had been found to be of borderline

intellectual functioning, the ALJ further noted that M.L. was not found to be mentally retarded and that M.L. had improved in his math skills and work habits, as well as appeared to be academically motivated. (Tr. 16.)

In light of the above, the plaintiff's assertion that the ALJ's "decision does not even discuss the other domains of functioning" (Pltf.'s Brief at 10) is without merit and does not provide a basis for relief.

B.    Marked and Severe Limitations

In his written decision, the ALJ determined, inter alia, that M.L. had less than marked limitation in the domains of Acquiring and Using Information, Attending to and Completing Tasks, and Interacting and Relating with Others. (Tr. 16-17.) Plaintiff contends that the ALJ erred in finding that M.L. did not suffer marked and severe limitations in these broad areas of functioning.

Pursuant to 20 C.F.R. § 416.926a(e)(2)(I), a child-claimant has a "marked" limitation in a domain when his

> impairment(s) interferes seriously with [his] ability to independently initiate, sustain, or complete activities. [His] day-to-day functioning may be seriously limited when [his] impairment(s) limits only one activity or when the interactive and cumulative effects of [his] impairment(s) limit several activities. "Marked" limitation also means a limitation that is "more than moderate" but "less than extreme."

20 C.F.R. § 416.926a(e)(2)(I).

A child will be found to have an "extreme" limitation when the impairment "interferes very seriously with [the child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3). Although the Commissioner must consider all relevant information in determining whether a child's limitations are "marked" or "extreme" in any domain, "[the] limitations *must* result from [the child's] medically determinable impairment(s)." 20 C.F.R. §§ 416.924a(b)(2), 416.926a(g)-(l) (emphasis added).

In this cause, upon examination of the testimony adduced at the hearing and the reports of Dr. Bouhasin, Dr. Jureidini and the St. Louis Public Schools, which included teacher observations, the November 2002 school evaluation, the February 2003 IEP review, and disciplinary reports, the ALJ concluded that M.L.'s limitations were less than marked in the domains of Acquiring and Using Information, Attending and Completing Tasks, and Interacting and Relating with Others. The ALJ specifically noted the record to show M.L. to have improved his math skills and work habits, and that M.L. exhibited motivation academically when in an isolated setting. The ALJ further noted M.L. to have received fewer disciplinary infractions than prior to October 2002. See Pepper ex rel. Gardner v. Barnhart, 342 F.3d 853, 855-56 (8th Cir. 2003) (no more than a moderate limitation where school records show child capable of doing work and that overall condition is improving).

The ALJ acknowledged M.L.'s measured borderline intellectual functioning and noted that such level "probably account[ed] for his slow progress in reading[.]" (Tr. 16.) The ALJ then went on to address M.L.'s behavior:

> As to behavioral concerns, there is no medical evidence, and not even any suggestions by school personnel, that the claimant has any kind of actual conduct or personality disorder, or that he has any kind of attention deficit and/or hyperactivity disorder. The claimant does not always pay attention in class, and he has a propensity to throw his weight around and bully some of the other children. At the same time, he has friends at school and at home, as even his mother admitted, and he has had fewer disciplinary citations since being placed in the small classroom setting at the end of 2002. There is no credible evidence of the claimant having any kind of *pathological* behavior problem. That is, there is nothing about his behavior that is self-uncontrollable. He seems to do what he wants when he wants to, and with whom (or to whom), and is capable of conforming his behavior to expected norms, even without medication or other therapy, when that suits him. He was described in February 2003 as being more immature than anything else [], and there are at least incipient indications that he is starting to outgrow the bad stuff. He was well mannered and behaved at the hearing, expressing normal interests and aspirations.

(Tr. 16-17.) (Emphasis in original.)

The ALJ's findings relating to M.L.'s improvement in academic performance, his relationships with other children, and his ability to conform his behavior are supported by substantial evidence on the record as a whole. Although the ALJ's decision

acknowledges, and the record supports, that M.L. experiences some
difficulties in these areas, the ALJ properly notes that the record
contains no medical evidence, nor any suggestion by school
personnel, to support a conclusion that such difficulties result
from any medically determinable impairment, that is, that M.L.'s
limitations are pathological in nature.[2]

        To the extent M.L.'s reported difficulties are the result
of his measured borderline intellectual functioning, the evidence
on the record as a whole nevertheless does not demonstrate M.L.'s
day-to-day functioning to be seriously limited on account thereof.
Indeed, the November 2002 assessment showed there to be no concerns
relating to M.L.'s adaptive behavior and cognitive functioning;
that M.L.'s adaptive levels at communication, daily living skills
and socialization were adequate; and that M.L.'s adaptive behavior
composite was adequate and age-appropriate.  The December 2002 IEP
meeting likewise noted that M.L.'s adaptive behavior, as reported
by his mother, showed M.L. to be functioning at an adequate level,
commensurate with his peers.  See 20 C.F.R. § 416.926a(b) (in
determining child-claimant's functioning, Commissioner looks "at
how appropriately, effectively and independently [the child]
perform[s] [his] activities compared to the performance of other
children [the child's] age who do not have impairments.").  While
there is evidence in the record that M.L. continues to engage in

_____

        [2]Pathological:  "[R]esulting from disease."  Stedman's Medical
Dictionary 1312 (26th ed. 1995).

behavioral problems despite his educational placement, there nevertheless is substantial evidence on the record as a whole to support the ALJ's conclusion that such difficulties are not such that they should be determined to be more than "less than marked." See Neal ex rel. Walker v. Barnhart, 405 F.3d 685, 688 (8th Cir. 2005) (may not reverse merely because substantial evidence may support different outcome).

In light of the above, there is substantial evidence on the record as a whole to support the ALJ's conclusion that, to the extent M.L.'s medically established impairment(s) result in any functional limitations in the domains of Acquiring and Using Information, Attending to and Completing Tasks, and Interacting and Relating with Others, such limitations do not rise to such a degree as to be considered "marked" or "extreme" limitations.

C. Weight of the Evidence

In making his determination that M.L. was not under a disability, the ALJ in this cause reviewed and considered the reports and observations of M.L.'s treating physicians, teachers, school evaluators, education documents, and the testimony of M.L. and his mother. Plaintiff claims, however, that the ALJ should have, but failed to set out any rationale supporting the weight given to such sources of evidence.

In determining whether a child-claimant's impairments functionally equal a listed impairment, the Commissioner seeks and

considers information from treating and other medical sources, parents and teachers, and others who see the child often and can describe the child's functioning at home, childcare, school, and in the community. 20 C.F.R. § 416.926a(b)(3). Consultative examinations may also be ordered. Id. A review of the ALJ's decision here shows him to have considered evidence from all sources who had any relevant information relating to M.L.'s impairments. The ALJ did not discredit evidence obtained from any source, nor did the ALJ determine to accord greater weight to one source over another. Instead, the ALJ determined that the evidence obtained from all sources failed to show M.L. to be under a disability. To the extent the ALJ discredited any information presented to the Commissioner, it was only the *claim* of M.L.'s mother that M.L.'s impairments resulted in marked or extreme limitations. For the reasons stated supra at Section V.B, however, this determination was supported by substantial evidence on the record as a whole.

Finally, contrary to plaintiff's argument, the ALJ did not rely only on the opinion of non-examining physicians in making his determination that M.L. was not under a disability. Indeed, a reading of the ALJ's decision shows him not to have referred to the Childhood Disability Evaluation Form in making his determination that M.L. was not disabled, but instead to have thoroughly considered and relied upon the reports and observations of M.L.'s

treating physicians, school evaluators, teachers, and mother. Plaintiff's contention that the ALJ's decision rested upon the opinions of non-examining physicians is without merit and should be denied.

## VI. Conclusion

The ALJ discussed all the evidence of record and determined M.L.'s impairment not to meet, medically equal or functionally equal a listed impairment, and thus that M.L.'s condition was not disabling. For all of the foregoing reasons, this determination is supported by substantial evidence on the record as a whole. Where substantial evidence supports the Commissioner's decision, the decision may not be reversed merely because substantial evidence may support a different outcome, or because another court could have decided the case differently. Neal ex rel. Walker, 405 F.3d at 688; Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001). Because there is substantial evidence on the record as a whole to support the ALJ's decision, the Commissioner's determination that M.L. is not disabled should be affirmed.

Therefore, for all of the foregoing reasons,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED** and plaintiff's Complaint is dismissed with prejudice.

Judgment shall be entered accordingly.


_Frederick R. Buckles_
UNITED STATES MAGISTRATE JUDGE


Dated this  *24th*  day of August, 2005.